Document Number Case Number
851   06-C-0657-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
07/09/2007 09:41:23 AM CDT

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM L. COLLINS,                                  OPINION AND ORDER
                         Plaintiff,
                                                         06-C-657-C
            v.

OFFICER HECTOR AGUIRRE,
LIEUTENANT CHAD BRECKLIN and
LIEUTENANT TODD STETZER,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Members of the Fitchburg Police Department suspected plaintiff William Collins of committing a number of serious crimes on November 26, 2005, including attempted sexual assault, reckless endangerment and arson. As a result of those suspicions, plaintiff was arrested and detained. The following day, the Wisconsin Department of Corrections placed him on a parole hold for reckless endangerment and for driving without a valid license.

At some point during plaintiff's detention, defendant Hector Aguirre, the detective investigating plaintiff's case, decided not to pursue charges against plaintiff because of evidence pointing to plaintiff's cousin, Robert Phipps, as the true culprit. (In fact, Phipps was later convicted of these crimes, but not until he had gone on a second crime spree in

1

September 2006 that included the murder of a young woman.  "Man Convicted of Killing Town of Burke Woman," Wisconsin State Journal, at B3 (Apr. 24, 2007).)  However, plaintiff was not released even after Aguirre decided not to pursue charges because the hold still remained in effect.  It was only on December 9, after plaintiff's parole agent spoke with both plaintiff and the police department, that the hold was dropped and plaintiff released.

Plaintiff brought this suit under 42 U.S.C. § 1983, contending that defendants Aguirre and Todd Stetzer (another Fitchburg police officer) violated his right to substantive due process by failing to take steps to secure his release even after they knew that they were not going to pursue charges against him.  In addition, plaintiff asserts a state law defamation claim against defendant Chad Brecklin, a Fitchburg police officer, for allegedly making false statements to the media about him.

Now before the court is defendants' motion for summary judgment.  With respect to plaintiff's federal claim, I agree with defendants that they did not violate plaintiff's right to due process.  To be sure, the law governing the requirements of due process is murky at best, particularly in the area of prolonged detention.  However, the basic standard is clear enough, which is whether the defendant was aware of a substantial risk that plaintiff was being held unlawfully and failed to respond reasonably to that risk.  Plaintiff cannot meet that standard because even after defendants decided not to pursue charges, they knew that plaintiff was being detained on a parole hold.

2

Plaintiff faults defendants for failing to communicate with his parole agent more effectively and efficiently about exculpatory evidence that they discovered and their decision not to pursue charges against him. Although I agree with him that defendants could have done more to try to insure a speedier release, plaintiff's view of the reach of the due process clause is not supported by the law. At a minimum, plaintiff would have to show that defendants intentionally concealed information from the parole agent to keep plaintiff detained. Plaintiff adduces no such evidence.

Plaintiff's frustration with his situation is certainly understandable. Anyone who was detained for a crime he knew he did not commit would likely feel a sense of injustice. But although defendants' conduct may not have been exemplary, it did not violate plaintiff's constitutional rights. Once the Department of Corrections issued the hold, it was the responsibility of that agency's employees to determine whether and when the hold should be dropped and whether plaintiff was getting all the process he was due. Accordingly, I must grant defendants' motion for summary judgment with respect to plaintiff's federal claim. Further, because I am dismissing the federal claim before trial and substantial federal resources have not been expended on the state law defamation claim, I decline to exercise supplemental jurisdiction over that claim.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.

3

## UNDISPUTED FACTS

### A. The Crimes

On November 26, 2005, several officers from the City of Fitchburg Police Department were dispatched in response to a report of a fire at 207 Whispering Pines Way in Fitchburg, Wisconsin. At the scene, officers discovered Heidi Hershberger, who was being taken to the hospital in an ambulance. Officers followed her to the hospital, where she gave them an account of the events leading up to the fire.

Hershberger told the officers that she had met a man introducing himself as "Keon" two weeks earlier at Schneid's Bar in Fitchburg, Wisconsin. Curtis Phipps, an acquaintance of Hershberger's friend Kristin, introduced Hershberger to "Keon." On November 26, Hershberger and "Keon" watched a movie at her apartment. During the movie, "Keon" made sexual advances toward her. When Hershberger rejected the advances, "Keon" began to choke her with a cord and then ordered her to lie on her stomach. He demanded her ATM card and number, threatening to kill her if she did not comply. After she gave him both, he continued to choke her until she lost consciousness.

When Hershberger awoke, she saw "Keon" pull the fire alarm before leaving her apartment. Shortly thereafter she saw flames coming from her roommate's bedroom. She exited her apartment, notified her neighbors, called the police and then retreated to the parking lot.

4

B.  Initial Police Investigation

At the hospital, Hersherberger told the officers that her I.D., ATM card, cellular phone and car had been stolen.  She described "Keon's" physical appearance.

Defendant Hector Aguirre, a detective for the Fitchburg police, arrived during Hershberger's questioning.  After being briefed by another officer, Aguirre took over the questioning.  Hershberger reported a number of facts about "Keon": (1) she had met him through Curtis Phipps at Schneid's bar; (2) he had a picture of a young girl in a red or pink shirt on his cellular phone; and (3) she had picked him up in the City of Madison at an apartment complex called Sunfish Court before going back to her apartment with him earlier that day.

Later in the evening, Fitchburg officers located Hershberger's car, which had been abandoned on a street in Madison.  One of the officers, Matthew Wiza, noticed a footprint next to the car.  Using a canine unit, officers tracked the driver of the car to Sunfish Court. The officers began at apartment #4, where Curtis Phipps, Sr. lived.  He told the officers that he did not know a "Keon," but that his son, Curtis Phipps, Jr. (through whom Hershberger had met "Keon") lived in apartment #1.

The officers went to apartment #1, where plaintiff William Collins answered the door.  Plaintiff allowed the officers to "look around" the apartment.  He told them that he did not know a Keon, that he lived in the apartment with his cousin Curtis and that he had

5

been home watching football all day.  While talking to plaintiff, officers noted at least two discrepancies.  First, at the time, plaintiff was unable to remember anything about the games he had been watching, including the scores, which team had won or even which teams were playing.  Second, plaintiff initially denied having driven at all that day, but he later retracted that statement when officers reminded him that he had earlier reported going to get Chinese food.  (Also, plaintiff denied any knowledge of Whispering Pines Way.  The police learned later that plaintiff's parole agent had had an office on Whispering Pines Way.)

The officers left the apartment and returned to the location of Hershberger's car. There, one of the returning officers (William Lear) learned that Hershberger's physical description of "Keon" was similar to his observation of plaintiff's appearance, that plaintiff was on parole and that plaintiff did not have a valid driver's license.

### C. Plaintiff's Arrest and Detention

1.  November 26

Wiza and Lear returned to Sunfish Court, where they observed plaintiff driving away in a Ford Explorer.  The officers stopped plaintiff "because [he] did not have a valid driver's license."  When plaintiff stepped out of the car, Wiza noticed that his footprint matched the one Wiza had seen next to Hershberger's car.  Lear searched plaintiff, finding a cellular phone and a wallet containing numerous $20 bills.  Lear informed plaintiff that he was

6

under arrest for operating a motor vehicle without a valid license.  (The booking sheet for plaintiff's arrest identifies the reason for plaintiff's arrest as "OMVWOC," or operating a motor vehicle without the owner's consent.  Neither side addresses this discrepancy, so I do not consider whether it has any significance.)

Plaintiff was taken to the Fitchburg police station, where Lear searched through plaintiff's cell phone.  Lear discovered a picture of a girl, approximately two years old, wearing a pink t-shirt.  In addition, Lear listened to voicemail messages that "Keon" had left on the cell phone of Hershberger's roommate.  Lear believed that "Keon's" voice sounded like plaintiff's.

Defendant Aguirre conducted further questioning of Hershberger at the police department.  Hershberger told him that four withdrawals had been made using her ATM card, totaling $480.  Other officers later told Aguirre that plaintiff matched Hershberger's description of "Keon," that plaintiff's footprint matched the one outside Hershberger's car and that plaintiff was found with $380 in his wallet.

2.  November 27

a.  Further questioning of plaintiff

The following day, defendant Aguirre questioned plaintiff further.  When discussing the officer's visit to plaintiff's apartment the previous day, plaintiff told Aguirre that officers

7

had arrived at his apartment around 8:00 p.m., which was the approximate time of the crimes. The actual time of the officers' arrival was approximately 10:30 p.m. This discrepancy aroused Aguirre's suspicions. Plaintiff also contradicted his statement from the day before that he did not know "Keon." Plaintiff now told Aguirre that "Keon" was actually Robert Phipps, plaintiff's cousin, but he did not explain how he knew this.

With respect to the large amount of cash in his wallet, plaintiff explained that he had just cashed his paycheck. In addition, plaintiff said he had seen Phipps early on November 26, with only a few dollars; he returned later with approximately $800. With respect to the matching footprints, plaintiff told Aguirre that "anyone can wear these type of gym shoes" to which Aguirre responded that he knew plaintiff's shoes were popular.

b.  Curtis Phipps identifies Robert Phipps as "Keon"

Later in the day, defendant Aguirre and several other officers returned to Sunfish Court, where they searched plaintiff's apartment. Aguirre spoke with Curtis Phipps, Jr., who reported the following: two weeks earlier he had invited his cousin, Robert Phipps, to join "them" at Schneid's bar; Robert Phipps introduced himself as "Keon" to the others in the group at the bar; Robert Phipps had used the name "Keon" to hide his true identity from Hershberger; and Robert Phipps often stayed with his father, Curtis Phipps, Sr., at Sunfish Court.

8

c.  Hershberger rejects Robert Phipps as "Keon"

Defendant Aguirre asked Hershberger to return to the police department to look at photo lineups.  Aguirre showed her two arrays of eight photographs each.  Plaintiff's picture was in the first array; Robert Phipps's picture was in the second.  When looking at the first group, Hershberger spent the most time looking at plaintiff's picture.  When looking at the second group, she excluded Phipps's picture, stating that the second group did not include a picture of "Keon."  She returned to the first group, focusing again on plaintiff and spending an "extensive" period of time reviewing his picture, but she ultimately stated that she could not tell with "100% certainty" whether plaintiff was "Keon."


d.  Wisconsin Department of Corrections places plaintiff on a hold

The Wisconsin Department of Corrections issued the following order to the Fitchburg Police Department:

> [PU]RSUANT TO THE AUTHORITY BY STATUTE AND ADMINISTRATIVE RULE OF THE DEPT OF [CO]RRECTIONS, YOU ARE DIRECTED TO HOLD IN CUSTODY THE ABOVE NAMED. THE ABOVE [NA]MED IS UNDER THE SUPERVISION OF THE WISCONSIN DEPT OF CORRECTIONS AND HAS [VI]OLATED THE TERMS OF SUPERVISION. THIS SUBJECT IS TO BE HELD IN YOUR CUSTODY [UN]TIL FURTHER INSTRUCTIONS ARE RECEIVED FROM A DULY AUTHORIZED REPRESENTATIVE [OF] THE DEPT OF CORRECTIONS.

Under the "remarks" section of the order was listed "1ST DEGREE RECKLESSLY

9

ENDANGERING SAFETY" and "OAS 1ST," or operating while driving with a suspended license as a first offense.

The hold was placed so that the allegation of reckless endangerment could be investigated further.  Defendant Aguirre knew this.

3.  <u>November 28 - November 30</u>

Defendant Aguirre questioned plaintiff again on November 28.  Plaintiff repeated his statement that Robert Phipps had committed the crimes, but when Aguirre asked him how he knew this, plaintiff stated only, "I just know it was him."  Aguirre told plaintiff that he need more corroborating information.   Aguirre questioned plaintiff a third time on November 29; during their meeting plaintiff offered to provide a DNA sample.

On November 30, Curtis Phipps, Jr., came to the Fitchburg Police Department on his own accord.  Although he said he feared for his life, he agreed to cooperate with the investigation.  In an array provided by defendant Aguirre, Curtis Phipps, Jr. identified a picture of Robert Phipps Jr. as "Keon," the person to whom Curtis introduced Hershberger at Schneid's Bar.

The same day, defendant Aguirre met with Kurt Sutor (plaintiff's and Robert Phipps's parole agent) and Jennifer Randall (Robert Phipps's former agent).  Aguirre played them a tape of "Keon's" voice.  Sutor "immediately" told Aguirre that the voice did not match

10

plaintiff's.  Randall said that she was "85 percent sure" that the voice belonged to Robert Phipps.  Sutor added that Robert Phipps had failed to make a November 29 appointment, the first time he had missed an appointment.

At some point between November 28 and 30, defendant Aguirre had a conversation with Jac Heitz in "the district attorney's office" during which the two decided that no charges would be "requested" until additional investigation was completed.  Aguirre had a second conversation with Heitz, possibly on December 6, regarding whether plaintiff should be charged.  The conversation included defendant Todd Stetzer, a lieutenant with the Fitchburg Police Department.  Stetzer said he did not want Heitz to charge plaintiff "at this time in order to allow him to help us differentiate between whether he was a party to a crime or whether he was a prime suspect."

By December 2, plaintiff's girlfriend had told defendant Aguirre that she was receiving threatening phone calls, accusing her of being a "snitch" and instructing her to "stop meddling."

On an unspecified date, plaintiff's mother called defendant Aguirre, reporting that family members had informed her that Robert Phipps was in Chicago and trying to find a new place to stay each night.

Also on an unspecified date, plaintiff told Aguirre, "he was sick and tired of sitting in jail, and did not want to lose his job, and wanted to know when he was going to court or

when he was going to be released." Plaintiff repeated this complaint to Aguirre on December 6.

### D. Plaintiff's Release

On December 5, plaintiff's parole agent left a voice mail message with the Fitchburg Police Department, asking whether plaintiff was going to be charged. On December 6, the parole agent met with plaintiff at the jail. The agent did not talk to plaintiff sooner because he was waiting for information from the Fitchburg Police Department regarding its investigation of plaintiff's involvement in the November 28 crimes. On December 7, someone from the police department told the agent that plaintiff was not going to be charged.

On December 7, Andrew Barth, a Dane County sheriff's deputy, reviewed the records of those in custody at the Dane County jail, where plaintiff was being held. Barth noted that plaintiff had been held since November 27 without an initial appearance and without any instructions from the Fitchburg Police Department. When Barth called the police department, the officer on the telephone told him that the department had faxed a document to the Dane County jail on November 28, indicating that plaintiff would not be charged for operating a vehicle without consent. The jail had no record of receiving that fax.

Later on December 7, defendant Stetzer sent the jail a fax, stating the following:

"Please consider this a formal request to drop the charges of Operating a Motor Vehicle without Owner's Consent from the below listed suspect's [plaintiff] booking sheet. Per conversations with the district attorney's office additional investigation will be completed related to this and other offenses, prior to charges being requested."

On December 9, plaintiff's parole agent issued an order to the Dane County jail, cancelling plaintiff's hold and directing his release.

Plaintiff was never charged with any crime. As of November 30, defendant Aguirre knew that plaintiff had not been charged. Sometime between November 28 and December 6, defendant Aguirre decided not to pursue charges against plaintiff. Defendant Aguirre knew that during the time plaintiff was incarcerated from November 27 to December 9, he did not receive a hearing.

E. <u>Press Release</u>

Defendant Chad Brecklin, a lieutenant with the Fitchburg Police Department, issued the following press release on November 27:

> On November 26, 2005, at approximately 8:00 p.m., Fitchburg Police, Fitchburg Fire, and Fitch-Rona EMS responded to 200 block of Whispering Pines Way for a report of a structure fire. The responding units found an apartment engulfed in flames. The preliminary investigation determined the fire was intentionally set after an altercation took place inside the apartment.
>
> The altercation took place between the 24 year-old female resident of the apartment

13

and a male acquaintance. During the altercation, the male rendered the female unconscious. The female awoke to the sound of the fire alarm and discovered her apartment on fire. She was able to flee to a neighbor's apartment.

The male stole the female's car and fled the scene. The stolen car was found a short time later near the intersection of Pike Drive and Traceway Drive. During the search of the area, a subject was contacted at a residence a short distance from where the car was found. This subject, identified as William L. Collins, age 41, of Madison, was later taken into custody and booked into the Dane County Jail on a tentative charge of operating a motor vehicle without owner's consent and a probation hold.

Residents of six other apartments were displaced from their homes due to the fire. The Dane County Sheriffs Office and Madison Police provided additional assistance. This incident remains under investigation.  Anyone with information is asked to call Fitchburg Police at 270-4300 or Madison Area Crimestoppers at 266-6014.

On the evening of November 27, the website for a Madison television station ran a story that stated the following: "Police report Collins stole the female's car and fled the scene Saturday night."

In addition to issuing the press release, defendant Brecklin spoke with members of the media regarding plaintiff's arrest and detention.  On November 28, an article appeared in the Capital Times that included the following statements:

• "Collins 'rendered the female unconscious,' according to Fitchburg Police Lieutenant Chad Brecklin."

• "Police believe the fire was intentionally set by William L. Collins after an altercation with a 24 year old woman described by police as 'an acquaintance.'"

14

OPINION

A. <u>Due Process Claim</u>

It is important at the outset to define the scope of plaintiff's federal claim.  He is not challenging his arrest and initial detention; he concedes that they were supported by probable cause.  Plt.'s Br., dkt. #41, at 17.   Rather, in his brief, plaintiff identifies two problems:  (1) defendants continued to hold him even after "there was clear evidence that he was not guilty of the crimes for which he was arrested"; and (2) defendants "fail[ed] to notify the jail or the parole officer" of either the evidence supporting plaintiff's innocence or the defendants' decision not to charge plaintiff with any crimes.  Plt.'s Br., dkt. #41, at 4-5.  His legal theory is substantive due process, which provides the standard for evaluating the constitutionality of detentions occurring after a probable cause determination, but before a conviction.  <u>Villanova v. Abrams</u>, 972 F.2d 792, 797 (7th Cir. 1992). (Neither side proposed any facts about a judicial probable cause determination, but both sides assume that there was one, Plt.'s Br., dkt. #41, at 2; Dfts.' Resp. to Plt.'s Prop. Find. of Fact, dkt. #51, at ¶ 58, so I will do the same.)

1. <u>Failure to release plaintiff</u>

Plaintiff's first asserted constitutional violation (continued detention in the face of exonerating evidence) runs into difficulties as soon as one looks at the defendants named in

15

the caption:  each of them is an officer for the Fitchburg Police Department, which was not the entity that had the authority to release plaintiff after November 27.   It is undisputed that on that date the Wisconsin Department of Corrections placed a parole hold on plaintiff for allegedly violating his parole.  Under the terms of the Department of Corrections order, plaintiff was to be held "until further instructions are received from a duly authorized representative [of] the Department of Corrections."  Thus, plaintiff could not be released until the department dropped the hold, which occurred on December 9, the same day that plaintiff was released.

Thus, plaintiff's theory of the case appears to be that defendants *caused* his continued detention by failing to communicate with the authorities who could release him and that this communication was required by the due process clause.  Can plaintiff win his case on that theory?

Certainly, plaintiff is correct that the due process clause places limits on the detention of suspects, even after a probable cause determination, as established by the cases he cites. Baker v. McCollan, 443 U.S. 137 (1979);  Armstrong v. Squadrito, 152 F.3d 564,  571 (7th Cir. 1998);  Patton v. Przybylski,  822 F.2d 697, 700-01 (7th Cir. 1987);  Coleman v. Frantz, 754 F.2d 719 (7th Cir. 1985).  See also State v. Wagner, 89 Wis. 2d 70, 277 N.W.2d 849 (1979).   But the contours of that right are fuzzy at best.  The case on which plaintiff relies most heavily, Armstrong, arguably raises more questions than it answers, as

16

it identifies multiple tests for determining a violation and appears to conflate procedural and substantive due process.

The easy case is when the jailer *knows* that the person being detained is innocent of any wrongdoing but continues to hold him nevertheless. That would be a clear case of an "exercise of power without any reasonable justification in the service of a legitimate governmental objective," which is the general standard for determining whether an officer has violated substantive due process. County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).

But that was not the case here. Setting aside for the moment the fact that plaintiff was being held under the authority of the state rather than the city of Fitchburg, defendants had reason to believe that plaintiff was being lawfully held. The hold was for both reckless endangerment and driving without a valid license. With respect to the reckless endangerment charge, it turned out that plaintiff was innocent. But it would be incorrect to say that defendants did not have any reason to believe otherwise. To be sure, there was compelling evidence suggesting that plaintiff was not the "Keon" who had assaulted Hershberger. But plaintiff is too dismissive of evidence going the other way: the physical similarity between plaintiff and Hershberger's description of the assailant, the similarity between plaintiff's voice and the assailant's, Hershberger's focus on plaintiff's picture in a photo array (and her rejection of the other suspect), the matching footprints and cell phone

17

pictures and plaintiff's multiple inaccurate and contradictory statements to the police.

The cases on which plaintiff relies did not involve evaluations of conflicting evidence requiring officers to make tough judgment calls about the propriety of continued detention. Rather, they each involved either a case of mistaken identity caused by clerical errors that could have been discovered easily, Baker, 443 U.S. 137; Patton, 822 F.2d 697, or a claim based solely on the failure to provide process, Armstrong, 152 F.3d 164; Coleman, 754 F.2d 719; a claim that I will address below.

As the Court of Appeals for the Seventh Circuit has held, once a probable cause determination is made, the officer's obligation to investigate claims of innocence is quite limited. Hernandez v. Sheahan, 455 F.3d 772, 777 (7th Cir. 2006) (upholding sheriff's policy of refusing to investigate claims of innocence after probable cause determination). "[P]olice may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence." Id. See also Thompson v. Olson, 798 F.2d 552, 556 (1st Cir. 1986) ("[H]aving once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car.") Thus, I would be hard pressed to conclude that defendants knew that there was no basis for the reckless endangerment charge even after defendants learned more information tending to incriminate Robert Phipps and exonerate plaintiff.

18

However, even if defendants knew that plaintiff was not guilty of reckless endangerment, that still leaves the driving without a license charge. Plaintiff concedes that he was guilty of this charge and that it provided a valid basis to hold him. Although that charge may not have been the primary reason for the hold, plaintiff does not suggest that there is anything improper about using the driving charge to provide a means to investigate the reckless endangerment charge. Thus, even if I assume that defendants would have had some obligation to plaintiff if they knew there was no basis for the parole hold, that was certainly not the case. Defendants had no reason to suspect that the hold was unlawful.

2. <u>Failure to inform parole agent that defendants were not pursuing charges against plaintiff</u>

Plaintiff's real grievance is not that there were no grounds to hold him, but that defendants did not tell the Department of Corrections once they decided not to pursue charges against him. But the validity of the parole hold was not contingent on whether defendants decided to pursue charges. Even if plaintiff was not going to be charged with reckless endangerment or driving without a license, the Wisconsin Department of Corrections could have decided independently to go forward with parole revocation proceedings on the basis of the same alleged conduct, either because the parole agent believed that the evidence against plaintiff for reckless endangerment was adequate to show a parole violation or because the agent believed that driving without a license was sufficient

19

by itself to justify revocation.

As it turns out, plaintiff's parole agent *was* influenced by defendants' decision not to pursue charges and defendant Aguirre knew that the parole hold was placed in order to allow investigation of the reckless endangerment charge. In that respect, defendants' failure to tell the agent about their decisions earlier may have been a "cause" of plaintiff's continued detention. But is that enough?

In my view, it is not. In the context of a claim for unlawful detention, a substantive due process violation occurs when the defendant is aware of a substantial risk that the plaintiff is being held unlawfully and fails to take reasonable steps to address the risk. <u>Armstrong</u>, 152 F.3d at 577. For plaintiff to prevail, the standard would have to change to not only impose liability on officials when they have reason to know detention is illegal, but also when they have reason to believe they could bring about release of someone who is held legally. In other words, plaintiff's argument is that if there is a causal link between the defendants' actions (or inaction) and the continued detention, that is enough to establish a constitutional violation.

I cannot agree with plaintiff's view because it would greatly expand liability under § 1983 beyond current law. Certainly, causation is a necessary component of liability, but it is not sufficient by itself. It is easy to see why. Any number of things defendants did could have influenced the parole agent to drop the hold, ranging from the silly to the sinister. For

20

example, what if defendants knew that the parole agent would release the hold if defendants agreed to find the agent's niece a date to the prom? Or if they falsely implicated another suspect? Obviously, the defendants' failure to do either of those things would not be an abdication of a constitutional duty, even if defendants knew that performing those actions would secure plaintiff's release. It is knowledge of illegal detention, not knowledge of an ability to influence a decision to release, that gives rise to a constitutional violation.

3. <u>Failure to turn over exculpatory evidence</u>

Plaintiff advances an alternative theory in his brief, which is that defendants had a constitutional duty to pass on to the parole agent all exculpatory information they learned about plaintiff during their investigation. In other words, even if defendants were not constitutionally required to keep the parole agent informed about their own charging decisions, they were at least required to tell the agent any facts they learned tending to exonerate plaintiff. Although plaintiff treats this argument as part and parcel of his substantive due process claim, the theory is somewhat different and relies on a separate line of cases.

Plaintiff relies primarily on <u>Newsome v. McCabe</u>, 256 F.3d 747 (7th Cir. 2001), in which the court held that the defendant police officers were not entitled to qualified immunity on a claim brought pursuant to § 1983 that the officers withheld exculpatory

information from the prosecutor.  In reaching this conclusion, the court relied primarily on

Brady v. Maryland, 373 U.S. 83 (1963), the seminal case in which the Supreme Court held

that due process requires prosecutors to disclose to criminal defendants all exculpatory

evidence.

There are a number of important differences between this case and Newsome.  First,

the due process right at issue in Newsome was not a substantive right to be free from

unlawful confinement but a procedural right to receive a fair trial.  In Newsome, the plaintiff

had been convicted of murder after a trial and was incarcerated for 15 years before proving

his innocence.  In his civil lawsuit, he alleged that the police officers purposely withheld

exculpatory evidence from the prosecutors.  Of course, plaintiff was not deprived of a fair

trial in this case because he was not tried at all or even prosecuted, making Newsome a poor

fit.

Jones v. City of Chicago, 856 F.2d 985, 993 (7th Cir. 1988), also cited by plaintiff,

was a civil rights suit in which the plaintiff accused police officers of withholding exculpatory

evidence from the prosecutor.  The court of appeals upheld a jury verdict in favor of the

plaintiff, even though he had not been convicted of the crime.  That case offers little

assistance to plaintiff, however, because both the court and the parties assumed that the

plaintiff could proceed under a "malicious prosecution" theory.  Id. at 992.  In Newsome,

the court acknowledged that "malicious prosecution" was a dubious theory after Albright v.

22

Oliver, 510 U.S. 266 (1994).  In any event, plaintiff does not advance a claim for malicious prosecution.

Another difference between this case and Newsome and Jones is that the Fitchburg officers were not investigating crimes *for* the Department of Corrections, at least not in the sense that they were required to assist the department or were accountable to it.  Under Wis. Stat. § 304.06(3), the department is responsible for its own investigations of parole violations.  It may have been the case that plaintiff's parole agent was relying in fact on the Fitchburg Police Department to conduct an investigation, but the agent's failure to do his own work does not mean that defendants become saddled with additional constitutional obligations.

Third, both Jones and Newsome involved the suppression of information over long periods of time.  In this case, to the extent that the parole agent remained in the dark, it was over a period of several days.  Thus, plaintiff would have required defendants to give plaintiff's parole agent an immediate play-by-play of everything they found, even if he wasn't asking for it and even though they were not accountable to him.

Finally and perhaps most important, there was evidence in Jones and Newsome that the police officers had *deliberately* withheld exculpatory information for the purpose of maintaining a prosecution that they knew was flimsy.  Plaintiff points to no evidence in this case that defendants "deliberately supplied misleading information," Jones, 856 F.2d at 994,

23

to the parole agent or even purposely concealed information from him.  As the Supreme Court held more than 20 years ago, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams,  474 U.S. 327, 328 (1986).  See also Sanders v. English,  950 F.2d 1152, 1161 (5th Cir. 1992) (police officer may be held liable for failing to turn over exculpatory evidence to prosecutor if failure is deliberate).

For all of these reasons, I cannot conclude that defendants violated plaintiff's due process rights for failing to provide up-to-the-minute updates of their investigation. Certainly, there was no law in November 2005 clearly establishing such a requirement, which means that defendants would be entitled to qualified immunity (a defense they raise in the alternative) even if the meaning of due process could be stretched as far as plaintiff would like.

4.  Failure to provide an initial appearance or other process

Plaintiff does not make it clear in his brief whether his claim includes a failure to provide him with a hearing or other process.  Although he comments on the absence of process and relies heavily on cases discussing officials' failures to insure that the plaintiff received an initial appearance, he never argues expressly that he was entitled to additional process.  To the extent he did mean to include such a claim, I conclude that defendants are

24

entitled to summary judgment on it.

Certainly, 13 days is a long time to be held with virtually no means of challenging that confinement. Particularly distressing is the fact that plaintiff languished in jail from November 30 to December 7 with apparently little to no investigation being performed on his case.  Thus, there is a plausible argument that the delay in bringing plaintiff to court was unreasonably long under the circumstances.  Wagner, 89 Wis. 2d at 76, 277 N.W.2d at 852 (detention is not unreasonably long when it is undertaken for proper purpose, including "interrogating the suspect or witnesses, checking out the story told by the suspect or witnesses, and gathering evidence").

Again, the problem for this claim is whom plaintiff decided to sue.  Because it was the Department of Corrections that ordered plaintiff's confinement as of November 27, it was the department's responsibility both to investigate the basis for the hold and provide the process necessary to justify the hold.  Wis. Stat. § 304.06(3) ("If the department is satisfied that any condition or rule of parole has been violated it shall afford the prisoner such administrative hearings as are required by law.")  Thus, if there was a failure to provide plaintiff with adequate process, it was a failure of the employees of the Department of Corrections.  Notably, plaintiff does not even attempt to address this issue in his brief.

There is one case, not cited by plaintiff, holding that an entity may be held liable for the suspect's prolonged detention, even if the entity is not directly responsible for a suspect's

placement in custody.  In <u>Luck v. Rovenstine</u>, 168 F.3d 323, 325 (7th Cir. 1999), the court held that, under the Fourth Amendment, the county could be held liable for the eight-day detention of a suspect who had been arrested by a state trooper, who left the suspect to languish at the county jail.  However, the court hinged in its conclusion on the fact that the county had physical custody of the plaintiff and had the authority to release him.  <u>Id.</u> at 326 ("In the final analysis, the sheriff is the custodian of the persons incarcerated in the jail, and as such, it is he who is answerable for the legality of their custody.").  In this case, it is undisputed that the defendants neither had physical custody of plaintiff (he was detained at the Dane County jail) nor the authority to release him.

Arguably, due process might have required defendant Aguirre to pass on to the parole agent plaintiff's complaints that he should be brought to court or released, on the ground that these protests gave Aguirre notice of a substantial risk that plaintiff was being held too long without a hearing.  In <u>Armstrong</u>, 152 F.3d at 580, the court held that correctional officers could be held liable for failing to forward the plaintiff's repeated complaints about not being brought to court.  Those facts are somewhat analogous to the situation in this case.

However, there are significant differences between this case and <u>Armstrong</u>, including the length of the detention (57 days in <u>Armstrong</u>), the relative knowledge of Aguirre and the person to whom he would have forwarded the complaint (the parole agent knew just as well as Aguirre that plaintiff was being detained on a hold) and the nature of the custodial

26

relationship between the plaintiff and defendants (in this case, that relationship was virtually nonexistent).  In any event, as I have noted, plaintiff failed to even argue expressly that he was entitled to additional process under the hold, much less that Aguirre was aware of such an entitlement and that he was required to report this to the parole agent, so plaintiff has waived that potential claim.  Pruitt v. City of Chicago, Illinois, 472 F.3d 925, 930 (7th Cir. 2006).  (Qualified immunity would also be a potential bar to such a claim, as Armstrong is hardly crystal clear on the scope of the reporting requirement.)

In granting summary judgment to defendants, I do not mean to belittle what must have been and continues to be a very difficult situation for plaintiff.  To call what happened to him unfortunate would be an obvious understatement.  However, this does not mean that defendants should be required to pay damages to plaintiff for his injuries. If the sole reason for plaintiff's confinement was his arrest by the Fitchburg police, there would be a much stronger argument that defendants (or at least defendant Aguirre) violated plaintiff's right to due process by failing to either provide him with a hearing or release him.  But once the parole hold was issued, plaintiff's continued custody became the responsibility of the Department of Corrections.  Defendants may be accused of not acting as assiduously as they could have in insuring that the department was fully informed, but a less than stellar job performance is not sufficient by itself to give rise to a constitutional violation, particularly when the court of appeals has held that prolonged detentions do not violate due process

27

unless the defendants' conduct "shocks the conscience."  <u>Armstrong</u>, 152 F.3d at 570. Defendants' conduct may have been disappointing, but it was not conscience shocking.

## B. <u>Defamation Claim</u>

This leaves plaintiff's state law defamation claim.  Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims when all of the federal claims have dropped out of the case.  Although dismissal of the state law claim is not mandatory in every instance, the general rule is that "if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims" <u>Williams Electronics Games, Inc. v. Garrity</u>, 479 F.3d 904, 907 (7th Cir. 2007) (citing <u>Groce v. Eli Lilly & Co.</u>, 193 F.3d 496, 501 (7th Cir. 1999)), particularly if substantial federal resources have not been expended on the state law claim to date, <u>Wright v. Associated Insurance Cos.</u>, 29 F.3d 1244, 1251-52 (7th Cir.1994).  In this case, I see no reason to retain jurisdiction over the state law claim and the parties do not provide one.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Hector Aguirre, Todd Stetzer and Chad Brecklin is GRANTED with respect to plaintiff's federal claim.  It is DENIED with respect to plaintiff's state law claim because I decline to exercise

supplemental jurisdiction over that claim.  The clerk of court is directed to enter judgment accordingly.

Entered this 9th day of July, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge